**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ORIUS CORP., et al. | ) | Case No. 05-63876 |
| | ) | [Proposed Jointly Administered Cases] |
| | ) | |
| Debtors. | ) | |

**EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING USE OF CASH
COLLATERAL AND GRANTING ADEQUATE PROTECTION AND
(II) APPROVING THE FORM AND METHOD OF NOTICE OF,
AND SCHEDULING, THE FINAL HEARING ON THE USE
OF CASH COLLATERAL**

Orius Corp. and certain of its subsidiary debtors (collectively, the "Debtors"), as debtors

and debtors-in-possession in the above-captioned cases, hereby move this Court (the "Motion")

for the following:

(a)     That the Court conduct a preliminary hearing to consider the Motion (the "Interim

Hearing") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules").

(b)     That after the Interim Hearing, the Court enter an interim order, in a form

substantially the same as that set forth in Exhibit A of this Motion (the "Interim Cash Collateral

Order"), authorizing the Debtors, pursuant to sections 363 of the United States Code, 11 U.S.C.

§§ 101, et seq. (as amended, the "Bankruptcy Code") and Rule 4001(b) of the Bankrutpcy Rules,

inter alia, to use the Cash Collateral[1] of the Lenders to fund the expenses set forth in the

Operating Budget upon the terms and conditions set forth in the Interim Cash Collateral Order

---

[1] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Interim Cash
Collateral Order.

and to grant adequate protection, pursuant to sections 363(c)(2)(A) and 363(e) of the Bankrutpcy

Code, to the Lenders pending a final hearing on this Motion; and

(c)     That the Court schedule a final hearing (the "Final Hearing") to consider entry of

a final order in substantially the same form as that set forth in Exhibit B to this Motion (the

"Final Order") authorizing on a final basis, inter alia, the use of the Lenders' Cash Collateral and

the grant of adequate protection.

In support of this Motion, the Debtors state as follows:

## I.
## JURISDICTION

1.     On December 12, 2005, each of the Debtors filed its respective voluntary petition

for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern

District of Illinois (the "Court"), commencing the above-captioned Chapter 11 cases.  The

Debtors continue to operate their business and manage their properties as debtors-in-possession

pursuant to Sections 1107(c) and 1108 of the Bankruptcy Code.  The Debtors have, pursuant to a

separate motion, moved this Court for an order authorizing the joint administration of their

Chapter 11 cases.

2.     No creditors' committee has yet to be appointed in these cases.

3.     This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of this Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and

1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The facts and circumstances supporting this Motion are set forth in the Affidavit

of William A. Shuttleworth in support of first-day motions filed concurrently herewith (the

"Shuttleworth Affidavit").

## II.
## BACKGROUND

5.       Orius Telecom Services, Inc. (together with its holding companies and other

affiliates, "Orius" or the "Debtors") was founded in 1997 with the goal of providing integrated

network infrastructure telecommunication services to customers throughout the United States.

Currently, Orius employs approximately 700 employees in 15 states.  Orius's principal office is

located in Barrington, Illinois.  Orius has its other major offices in the following cities or suburbs

thereof: St. Louis, Missouri; Minneapolis, Minnesota; Boise, Idaho; and Portland, Oregon.

6.       Orius is a nationwide provider of construction, deployment, and maintenance

services to customers operating within the telecommunications, broadband, gas, and electric

utilities, and government industries.  Orius generated operating revenues of approximately

$135,866,000 for the year ended December 31, 2004.  Orius is expected to generate between $95

million and $105 million in operating revenues for the year ending December 31, 2005, plus

approximately $20 million dollars from the operation and sale of one of its affiliates, Texel

Corporation, the assets of which were sold on October 7, 2005.  The Debtors' chapter 11

petitions listed assets aggregating approximately $64,249,000 and liabilities aggregating

approximately $114,319,000, on a consolidated basis.

7.       The Debtors' corporate structure includes a holding company, Orius Corp., a

Delaware corporation, which owns an intermediate holding company, NATG Holdings, LLC

("NATG"), a Delaware limited liability company.  NATG is the sole owner of Orius Telecom

Services, Inc. ("OTSI"), a Florida corporation, which in turn is the direct or indirect owner of

eleven other affiliates, all of which are among the Debtors herein.[2]

---

[2] The Debtors in the above-captioned case are Orius Corp., NATG Holdings, LLC, Orius Telecom Services, Inc.,
Orius Telecommunications Services, Inc., Orius Central Office Services, Inc., Texor Corporation, CATV Subscriber

8.      Prior to the commencement of these chapter 11 cases, Orius liquidated substantially all of the assets of two of its subsidiaries in 2005.  First, it conducted a sale of virtually all of the assets of COSG in a sale that closed on February 14, 2005 for a stated purchase price of $1,600,000 which, after a reduction for transaction costs associated with this sale, was used as cash collateral to secure certain indebtedness owing by Orius to its secured lenders.  Second, on October 7, 2005, Orius closed the sale of substantially all of the assets of Texel Corporation yielding net proceeds aggregating approximately $1,467,000 which was used as cash collateral to secure certain indebtedness owing to Orius's lenders.

9.      Each of the Debtors in these cases had previously filed, on November 15, 2002, a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The prior cases were jointly administered and styled In re Orius Corp., et al., Case No. 02-45127.  Each of the prior chapter 11 cases for these Debtors was filed to effectuate a pre-packaged plan of reorganization created through negotiations with the Debtors' secured lenders (the "Lenders").  During the pendency of the prior chapter 11 cases, the Debtors continued to operate their businesses as debtors-in-possession.

10.     On January 8, 2003, this Court entered an order confirming the Joint Prepackaged Plan of Reorganization of Orius Corp. and its Affiliated Debtors (the "2003 Plan").  The 2003 Plan became effective on January 23, 2003, and was substantially consummated soon thereafter.  On August 20, 2003, this Court entered a final decree closing all but one of the prior chapter 11 cases.  On November 16, 2005, this Court entered a final decree closing the remaining chapter 11 case.

---

Services, Inc., Hattech, Inc., Channel Communications, Inc., LSN, Inc., In re Copenhagen Utilities & Construction, Inc., In re LISN Inc., and U.S. Cable, Inc..

11.    The primary purpose and effect of the prior chapter 11 cases for these Debtors

was to reduce the obligations of Orius under its then existing credit agreement with its Lenders.

As of the commencement of those prior chapter 11 cases, the Debtors' loan obligations to the

Lenders aggregated approximately $314,000,000 in outstanding indebtedness, plus contingent

reimbursement obligations in respect of letters of credit issued pursuant to the pre-petition loan

agreement aggregating approximately $27,800,000.  Pursuant to the revisions to the financing

from the Lenders set forth in the pre-packaged prior Chapter 11 plan, the Lenders reduced its

post-petition credit facilities to approximately $100,000,000 in term debt, plus a revolving line of

credit not to exceed $45,000,000.  The pre-packaged plan also provided that, in exchange for

reducing the amounts of the term loans owed to them by the Debtors, the Lenders received

approximately 85% of the stock of the reorganized Debtors.  Consequently, members of the

Lenders own the majority of Orius Corp.'s stock.

12.    In addition to the businesses run by Orius growing too large too quickly, the

businesses were subject to severe market pressures in 2000, thus leading to the previous chapter

11 cases.  As a result, Orius scaled down its operations and sold certain businesses both before

and after the prior chapter 11 cases, significantly reducing the size and revenues of its combined

operations.  For the year ending December 31, 2000, Orius had operating revenues aggregating

approximately $735,153,167.  For the year ending December 31, 2001, Orius had operating

revenues aggregating approximately $519,421,814.  For the year ending December 31, 2002,

Orius had operating revenues aggregating approximately $302,705,708.  For the year ending

December 31, 2003, Orius had operating revenues aggregating approximately $184,410,659.  For

the year ending December 31, 2004, Orius's operating revenues had declined to approximately

$135,886,023.  As set forth above, Orius's gross revenues for the year ending December 31,

2005 are expected to be somewhere between $95,000,000 and $105,000,000, exclusive of approximately $20,000,000 in revenue and sales proceeds from Texel Corporation.

13.     In addition to declining operations and a corresponding decline in operating revenue, the profitability of the Debtors following their prior chapter 11 cases has continued to be negative or marginal at best. Orius's earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the year 2003 was negative ($7,361,972). For the year 2004, Orius posted EBITDA of negative ($4,233,106). For the year 2005, it is estimated that Orius's EBITDA will range from ($1,500,000) to ($2,500,000).

14.     The Debtors' operational and profitability problems are due in part to a steep decline in the capital expenditures in the telecommunications industry beginning in 2000. In addition, the pre-packaged plan confirmed in the prior chapter 11 cases still left the Debtors with a load of term loan debt that was and is too large for what had become a much smaller business in terms of revenue and scope of operations. A lack of sufficient working capital under the post-confirmation lending structure also has made it infeasible for the Debtors to bid for new contracts that otherwise, in the opinion of management, probably would have been available to the Debtors in 2004 and 2005. For the same reason, these Debtors have not been in a position to bid for many new contracts for 2006. Finally, extensive negotiations between the Debtors and their Lenders made it clear that the recapitalization of the business by the Lenders would not occur, although management had believed that a recapitalization would be the most desirable option.

15.     On January 23, 2003, shortly after confirmation of the prepackaged plan of reorganization in the prior chapter 11 cases, the Debtors entered into a credit agreement with the Lenders (as amended from time to time, the "Credit Agreement"). The Credit Agreement

includes a Revolving Credit Facility (the "Revolver") that is comprised of two tranches representing different Lenders: Tranche A and Tranche B.  The Revolver also includes a letter of credit facility (the "Letter of Credit").  The Credit Agreement also includes a $100,000,000 senior secured term loan, which is allocated between a $42,500,000 Term A Loan, a $42,500,000 Term Loan B-1, and a $15,000,000 Term B-2 loan .  As of December 12, 2005, the cash drawn on the Revolver by the Debtors totals $7,000,000; the principal amount owed by the Debtors on the Term A note is $42,141,455; the principal amount owed on the Term B-1 note is $45,584,286; the principal amount owed by the Debtors on the Term B-2 note is $1,587,617; and the amounts potentially owed by the Debtor under the letters of credit totals $13,580,033.

16.    With the cooperation and approval of the Lenders, the Debtors have obtained a "stalking horse" bid for the sale of substantially all of Orius's fixed assets to Dycom Industries, Inc. ("Dycom") under Section 363 of the Bankruptcy Code.  The Debtors and Dycom executed an Asset Purchase Agreement shortly before the commencement of the present chapter 11 cases. Under the terms of the Asset Purchase Agreement (a) virtually all of the Debtors' fixed assets will be sold, (b) most of the Debtors' non-managerial employees will be employed by Dycom, and (c) executory master customer contracts representing most of the Debtors' revenue will be assumed by Dycom.  The Debtors believe that the sale to Dycom or a bidder presenting a better offer pursuant to the bid procedures approved by this Court is in the best interests of the Debtor and its creditors, including the Lenders, given the circumstances that the Debtors face.  The Debtors anticipate that any sale pursuant to Section 363 of the Bankruptcy Code will be followed shortly thereafter by a plan of liquidation with respect to the remaining assets and liabilities of Orius.

###### A.       The Debtors' Pre-Petition Debt Structure

17.       Deutsche Bank Trust Company Americas (the "Agent") has filed a master proof of claim in this case on behalf of itself and the Lenders in each of the Cases (collectively, the "Master Proof of Claim").  The Master Proof of Claim was executed and filed in accordance with applicable Bankruptcy Rules and constitutes prima facie evidence of the validity and amount of the secured claim of the Agent and each of the Lenders pursuant to Bankruptcy Rule 3001(f).[2]

18.       The Master Proof of Claim reflects, and the Debtors acknowledge, that from time to time prior to the Petition Date, NATG Holdings, LLC (the "Borrower") borrowed money and received other financial accommodations from the Agent and the Lenders under that certain Credit Agreement dated as of January 23, 2003 (as amended, the "Credit Agreement") and incurred additional obligations in connection therewith, including without limitation, obligations for payment or reimbursement of certain of the Agent's fees, costs and expenses.  The Master Proof of Claim also reflects that the other Debtors (collectively, the "Guarantors"), absolutely and unconditionally guaranteed the Obligations under that certain Holdings Guaranty, dated as of January 23, 2003, as amended, and that certain Subsidiary Guaranty, dated as of January 23, 2003, as amended.

19.       The Master Proof of Claim further reflects, and the Debtors acknowledge, that the Obligations is secured by security interests and liens in and against substantially all property of the estates of the Borrower and the other Debtors in favor of the Agent on behalf of itself and the Lenders (the "Prepetition Collateral").

---

[2]       See Paragraph 24 of the Interim Cash Collateral Order concerning the intended scope of the findings of fact and the reservation of rights in respect of objections, if any, of parties in interest, other than the Debtors, to the Master Proof of Claim.

20.    The Master Proof of Claim further reflects, and the Debtors acknowledge, that as of the opening of business on the Petition Date, (i) the aggregate outstanding principal amount of Loans included in the Obligations was $96,313,359.57, (ii) the aggregate outstanding amount of accrued and unpaid interest and fees included in the Obligations was $45,752.47, (iii) the aggregate outstanding undrawn amount of Standby Letters of Credit included in the Obligations was $13,580,033.00, as identified in Exhibit A to the Interim Cash Collateral Order, and (iv) the total amount of the Obligations outstanding as of the Petition Date was approximately $109,939,145.04, exclusive of fees, costs and other expenses for which the Agent and the Lenders are entitled to payment or reimbursement.

21.    The Master Proof of Claim further reflects, and the Debtors acknowledge, that the Obligations and the security interests and liens in and against the Prepetition Collateral securing the Obligations are evidenced by certain loan, security and other collateral agreements between and among the Agent, on behalf of itself and the Lenders, the Borrower and the Guarantors, as they may have been amended from time to time, certain promissory notes executed by the Borrower in favor of the Lenders, and other agreements, documents, guaranties and instruments entered into, delivered or otherwise related to the Obligations and the Prepetition Collateral (collectively, the "Lender Agreements").  A list of the principal Lender Agreements has been filed as an exhibit to the Master Proof of Claim.

22.    The Master Proof of Claim further reflects, and the Debtors acknowledge, that the Agent has perfected its security interests and liens in and against the Prepetition Collateral by possession thereof or by the filing of financing statements and other documents as applicable in the appropriate filing offices, a list of which is attached to the Master Proof of Claim.

23.     Pursuant to sections 363(a) and 552(b) of the Bankruptcy Code, certain cash and cash equivalents held by the Debtors as of the commencement of the above-captioned bankruptcy cases (the "Cases") and the proceeds, products, offspring, rents or profits of the Prepetition Collateral received by the Debtors after the commencement of the Cases constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code and in which the Agent on behalf of itself and the Lenders has an interest within the meaning of sections 363(c)(2) and 363(e) (the "Cash Collateral").

**III.**
**RELIEF REQUESTED**

24.     By this Motion, the Debtors seek, among other things,:

(a)     authorization under Bankrutpcy Code sections 361, 363(c), and 363(e) to use the Cash Collateral and provide adequate protection to the Lenders with respect to the Debtors' use of Cash Collateral and other diminution in value of the Prepetition Collateral.

(b)     (i) the continued accrual and payment of interest on the Tranche A Revolving Loans, Term B-2 Loans and Fees on the Standby Letters of Credit, at the non-default rate and pursuant to the terms applicable under the Lender Agreements (without giving effect to any defaults thereunder), and (ii) the continued accrual and payment of all reasonable out-of-pocket costs and expenses of the Agent, including without limitation reasonable fees and out-of-pocket expenses of its counsel and financial advisor; and

(c)     the scheduling of the Final Hearing on this Motion and the establishment of notice procedures in respect of the Final Hearing to consider entry of

the Final Order approving the use of Cash Collateral and the granting of

adequate protection to the Lenders on a final basis.

## IV.
## BASIS FOR RELIEF

25.    The Debtors have determined that the use of the Cash Collateral is necessary for

the Debtors to maintain sufficient liquidity so that they may continue to operate their businesses

in chapter 11 through the sale of  substantially all of their fixed assets pursuant to section 363 of

the Bankrutpcy Code (the "363 Sale"), the collection of their accounts receivable, and their

subsequent liquidation.  Without immediate access to the Cash Collateral, the Debtors will not be

able to pay the ongoing costs of running their business and administering their estates, the result

of which will be the irreparable damage to the value of the Debtors and the thus the value of the

Lenders' collateral.  Indeed, the Debtors have determined that if they are not allowed the use of

the Cash Collateral, they could not maintain their businesses, and their cases likely would be

converted to a case under chapter 7 of the Bankruptcy Code in relatively short order.

26.    Access to the Cash Collateral will provide the Debtors' customers, vendors, and

subcontractors with the requisite security that the Debtors will be able to continue conducting

their businesses in the ordinary course without interruption.  Furthermore, the stalking horse

Asset Purchase Agreement between the Debtors and Dycom requires that the Debtors make

commercially reasonable efforts to cause their business to be conducted in the ordinary course

until the closing of the sale. Access to the Cash Collateral is needed to comply with this

requirement.

27.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use,

sell, or lease cash collateral ... unless (A) each entity that has an interest in such cash collateral

consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in

accordance with the provisions of this section."  Additionally, section 363(e) provides that, on

request of an entity that has an interest in cash collateral to be used, the court may condition such

use as is necessary to provide adequate protection of such interest.  The Debtors request that the

Court approve its use of the Cash Collateral to pay wages, salaries, operating expenses, success

and stretch incentive bonus payments (if pursuant to a final order of this Court) and certain

professional fees incurred during the pendency of these cases, all as reflected in the Operating

Budget.

      28.    The Lenders consent to the use of their Cash Collateral as contemplated in the

Interim Cash Collateral Order and Final Order so long as the Lenders receive adequate protection

in the form of the Postpetition Collateral and the other protection provided therein.

      29.    Bankruptcy Rule 4001(b) provides that if, as here, a debtor seeks to use cash

collateral during the 15-day period following the filing of a motion requesting authorization to

use such cash collateral, the court may authorize the use of "only that amount of cash collateral

as is necessary to avoid immediate and irreparable harm to the estate pending final hearing."

Bankruptcy Rule 4001(b)(2).  After the 15-day period, the request for financing is not limited to

those amounts necessary to prevent destruction of the debtor's business.

      30.    The Debtors' request for interim use of Cash Collateral pursuant to the Interim

Cash Collateral Order is necessary to avoid immediate and irreparable harm to the Debtors.  To

ensure a smooth transition into chapter 11 and an expedient path to the 363 Sale and subsequent

liquidation of the Debtors' assets, it is imperative that the Debtors be authorized to use Cash

Collateral pursuant to section 363 of the Bankruptcy Code to avoid immediate and irreparable

harm to the Debtors' estates.  Absent the use of Cash Collateral for their continuing business

operations, the Debtors will be unable to fund their operating expenses in the ordinary course,

which would likely result in a shutdown of operations from which they could not recover.

Consequently, if interim relief is not obtained, the Debtors' attempt to sell their assets pursuant

to the 363 Sale may well be doomed at the outset, to the detriment of the Debtors' estates and

creditors.

31.     Without immediate access to postpetition financing, the Debtors expect to suffer

an acute cash shortage in the coming days that threatens their ability to maintain operations in the

short term - even through the date of the Final Hearing.  Accordingly, the Debtors request that,

the Court grant the relief requested herein on an interim basis, subject to final approval at the

Final Hearing.

## V.
## SUMMARY OF CERTAIN PROVISIONS IN COMPLIANCE WITH LOCAL RULE 4001-2.

32.     Pursuant to Local Rule 4001-2, the Debtors highlight the following provisions of

the Interim Cash Collateral Order and the Final Order:

| Requisite Provision | LOCATION IN ORDER AND SUMMARY OF TERMS | JUSTIFICATION |
|---|---|---|
| Local Rule 4001-(A)(2)(a): Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the pre-petition secured creditors (i.e., clauses that secure pre-petition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its pre-petition security agreement or applicable law. | None | Not applicable. |
| Local Rule 4001-2(A)(2)(b): Provisions or findings of fact | The Debtors acknowledge in ¶ E of the Interim Cash | The Debtors cannot operate without the use of Cash Collateral.  Paragraph |

| Requisite Provision | LOCATION IN ORDER AND SUMMARY OF TERMS | JUSTIFICATION |
|---|---|---|
| that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured creditor's pre-petition lien or debt or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order and the creditors' committee, if formed at least 60 days from the date of its formation to investigate such matters. | Collateral Order and ¶ G of the Final Order that the Master Proof of Claim was filed in accordance with applicable Bankruptcy Rules and constitutes prima facie evidence of the validity and amount of the Agent's and Lenders' secured claims<br><br>The Debtors acknowledge in ¶ F of the Interim Cash Collateral Order and ¶ H of the Final Order that the Borrower borrowed, and the Guarantors absolutely and unconditionally guaranteed, the Obligations.<br><br>The Debtors acknowledge in ¶ G of the Interim Cash Collateral and ¶ I of the Final Order that the Obligations is secured by security interests and liens in and against substantially all property of the estates of the Borrower and the other Debtors in favor of the Agent on behalf of itself and the Lenders<br><br>The Debtors acknowledge in ¶ H of the Interim Cash Collateral and ¶ J of the Final Order  the aggregate outstanding principal amount of Loans included in the Obligations, the aggregate outstanding amount of accrued and unpaid interest included in the Obligations, the aggregate outstanding | 24 of the Interim Cash Collateral Order provides that parties in interest, other than the Debtors, with an investigation period of sixty (60) days after the Petition Date to file an objection to the allowance of the Master Proof of Claim, seek a determination of the validity, priority, or extent of the security interests and liens of the Agent and the Lenders, or seek avoidance or subordination of the security interests and liens of the Agent and the Lenders in the Prepetition Collateral.  This time frame affords such parties in interest ample opportunity to investigate such claims. |

| Requisite Provision | LOCATION IN ORDER AND SUMMARY OF TERMS | JUSTIFICATION |
|---|---|---|
| | undrawn amount of Standby Letters of Credit included in the Obligations, and he total amount of the Obligations outstanding.<br><br>The Debtors acknowledge in ¶ I of the Interim Cash Collateral Order and ¶ K of the Final Order that the Obligations and the security interests and liens in and against the Prepetition Collateral securing the Obligations are evidenced by the Lender Agreements.<br><br>The Debtors acknowledge in ¶ J of the Interim Cash Collateral Order and ¶ 1 of the Final Order that the Agent has perfected its security interests and liens in and against the Prepetition Collateral | |
| Local Rule 4001-2(A)(2)(c): Provisions that seek to waive any rights the estate may have under § 506(c) of the Bankruptcy Code. | Paragraph 11 of the Interim Cash Collateral Order and the Final Order provides that the Debtors and all parties-in-interest are deemed to have waived all rights under section 506(c) with respect to expenditures during the period the Interim Order or, as the case may be, the Final Order are in effect.<br><br>Paragraph 12 of the Interim Cash Collateral Order and the Final Order provides that | The Debtors cannot operate without the use of Cash Collateral. The Interim Cash Collateral Order seeks a waiver of rights under section 506(c) only with respect to expenditures made during the period of the Interim Cash Collateral Order. The 506(c) waiver is in consideration of the "Carve-Outs" and of the availability of Cash Collateral to fund the Operating Budget. |

| Requisite Provision | LOCATION IN ORDER AND SUMMARY OF TERMS | JUSTIFICATION |
|---|---|---|
| | any liability of the Debtors' estates for failing to comply with non-bankruptcy law is not a reasonable, necessary cost or expense of preserving the Prepetition Collateral. ¶ | |
| Local Rule 4001-2(A)(2)(d): Provisions that immediately grant to the pre-petition secured creditor liens on the debtor's claims and causes of action arising under §§ 544, 545, 547, 548, and 549 of the Bankrutpcy Code. | Paragraph 3 of the Interim Cash Collateral Order grants security interests in, and liens on, the Debtors Avoidance Actions, but only to the extent of the Cash Collateral used by the Debtors and the amount of other diminution in the value of the Prepetition Collateral. | The Lenders are significantly undersecured and all of the Debtors' prepetition assets are already encumbered. The Debtors intend to seek an order granting the Lenders liens on the Debtors avoidance actions only pursuant to final order and not under the interim order. In addition, the Lenders' liens on avoidance actions are only to the extent of the amount of Cash Collateral used by the Debtors and the amount of other diminution in the value of the Prepetition Collateral. |
| Local Rule 4001-(A)(2)(e): Provisions that deem pre-petition secured debt to be post-petition debt or that use post-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's debt, other than as provided in § 552(b) of the Bankruptcy Code. | None | Not Applicable |
| Local Rule 4001-2(A)(2)(f): Provisions that provide treatment for the professionals retained by a committee appointed by the United States Trustee different from that provided for the professionals retained by the debtor with respect to a professional fee carve-out and provisions that limit the committee counsel's | None | Not Applicable |

| Requisite Provision | LOCATION IN ORDER AND SUMMARY OF TERMS | JUSTIFICATION |
|---|---|---|
| use of the carve-out. | | |
| Local Rule 4001-2(A)(2)(g): Provisions that prime any secured lien, without the consent of that lienor. | None | Not applicable. |
| Local Rule 4001-2(A)(2)(h):  A declaration that the order does not impose lender liability on any secured creditor. | None | Not applicable |
| Local Rule 4001-2(A)(2)(i): Provisions that grant the lender expedited relief from the automatic stay in § 362 of the Bankruptcy Code, or relief from the automatic stay without further order of the court. | None | Not applicable. |

33.     The Debtor use of Cash Collateral shall be as set forth in the Operating Budget, which also contains the maximum amount of such use.  As protection for the interests of the Agent and the Lenders in the Cash Collateral and the Prepetition Collateral, the Interim Cash Collateral Order and Final Order grant the Postpetition Collateral to the Agent on behalf of itself and the Lenders with the same relative priority as provided under the Lender Agreements.  The Postpetition Collateral includes:

(a)     replacement security interests and liens in and against all proceeds, products, offspring, rents or profits of the Prepetition Collateral to the extent provided under section 552(b) of the Bankruptcy Code; and

(b)     additional security interests and liens against all other property of the Debtors whether existing on or generated or acquired on or after the Petition Date, including, without limitation, (i) any actions to avoid any transfers or payments that occur after the Petition

Date, (ii) any actions to return retainers held by the Debtors' professionals, (iii) any actions to avoid transfers of property on which the Agent has a lien or security interest; and (iv) on entry of the Final Order, all other Avoidance Actions, but in any event only to the extent of the amount of Cash Collateral used by the Debtors and the amount of other diminution in the value of the Prepetition Collateral.

34.    The security interests and liens of the Agent and the Lenders in the Postpetition Collateral granted under the terms of the Initial Cash Collateral Order and Final Order are senior to the rights of all entities, including without limitation, the Debtors and any successor trustee in these or any subsequent cases under the Bankruptcy Code, subject only to statutory or other liens existing prior to the commencement of these Cases, if any, that are valid, perfected and non-avoidable with priority over the security interests and liens of the Agent in and against the Prepetition Collateral or Postpetition Collateral.

35.    The security interests, liens and priority claims granted to the Agent and the Lenders in the Interim Cash Collateral Order and the Final Order shall have priority over all costs and expenses of administration incurred and shall have priority over any and all unsecured claims and expenses in these Cases, whether incurred or arising prior or subsequent to the entry of this Interim Cash Collateral Order, except for:  (a) claims for fees payable to the United States Trustee under 28 U.S.C. § 1930(a); (b) allowable unpaid fees and expenses of professionals retained by the Debtors with Court approval accrued through the date authority to use Cash Collateral terminates under the terms of the Interim Cash Collateral Order or Final Order not exceeding $700,000 in the aggregate, together with the amount of any Court-approved earned and unpaid sales fee due Conway Del Genio arising from the closing of the Purchase Agreement, not to exceed $400,000, or such other additional amounts as the Debtors and the Agent may

agree (the "Debtors' Professionals Carve-Out"), and provided that such fees and expenses are not

incurred for services in connection with challenging the claim of the Agent and the Lenders or

challenging any security interests or liens of the Agent or investigating, commencing or

prosecuting any claim or cause of action against the Agent based in whole or in part upon facts

or circumstances existing prior to the Petition Date; (c) success and stretch incentive payments to

the Debtors' senior management to the extent such payments are approved by a final order of this

Court; (d) payment of obligations (other than to the Debtors' professionals) incurred under the

Operating Budget, and due and owing, prior to the occurrence of a Termination Event; (e) the

Expense Reimbursement; and (f) the Breakup Fee.  The Breakup Fee and Expense

Reimbursement will be deemed automatically added to the Operating Budget if and when they

become due and payable under the Bid Procedures Order (as defined in the Purchase

Agreement).

36.    Under the Interim Cash Collateral Order and Final Order, the following constitute

Termination Events:

(a)    (a) entry of an order converting any of the Cases to a case under chapter 7

of the Bankruptcy Code; (b) entry of an order dismissing or suspending any of the Cases; (c)

entry of an order in any of the Cases appointing a trustee under section 1104 of the Bankruptcy

Code; (d) entry of an order in any of the Cases appointing an examiner under section 1104(b) in

any of the Cases with powers beyond those set forth in section 1106(a)(3) and (4) of the

Bankruptcy Code;

(b)    any term or provision of the Interim Cash Collateral Order or Final Order

is modified in any respect without the prior express written consent of the Agent in each

instance;

(c)     any of the Debtors assert that any of the terms or conditions of the Interim Cash Collateral Order or Final Order are not valid and binding;

(d)     the payment by the Debtors, without the Agent's written consent in each instance, of aggregate disbursements on a cumulative basis for the period from Monday of the calendar week in which these Cases were filed through the end of each calendar week thereafter, taking each such period as one accounting period, in excess of (i) for each such period ending, respectively, December 23, and December 30, 2005, 107.5% of such disbursements projected to be made in the Operating Budget, and (ii) 105% of such disbursements projected to be made in the Operating Budget for each such respective period thereafter;

(e)     except as otherwise permitted by the Agent in writing in each instance, the Debtors receive aggregate cash receipts on a cumulative basis for the period from Monday of the calendar week in which these Cases were filed through the end of each calendar week thereafter, taking each such period as one accounting period, in an amount less than (i) for each such period ending, respectively, December 23, and December 30, 2005, 85% of such receipts projected to be received in the Operating Budget, (ii) for each such respective period ending in January, 2006, 90% of such receipts projected to be received in the Operating Budget, and (iii) for each such respective period ending thereafter, 92.5% of such receipts projected to be received in the Operating Budget;

(f)     the payment by the Debtors without the Agent's prior written consent in each instance of any expenditure that is not reflected as an expense category in the Operating Budget;

(g)     any of the Debtors breach or otherwise fail to abide by any of the terms or provisions of the Interim Cash Collateral Order or Final Order;

(h)      for purposes of the Interim Cash Collateral Order, this Court does not

enter a final order authorizing Debtors' use of Cash Collateral and adequate protection within 45

days of entry of this Interim Order on terms in form and substance satisfactory to the Agent or

the entry of the final order is stayed;

(i)      the Court does not enter the Bid Procedures Order in form and substance

satisfactory to the Agent within thirty (30) days following the Petition Date or is stayed

following entry thereof;

(j)      the Court does not enter the Sale Order (as defined in the Purchase

Agreement) in form and substance satisfactory to the Agent within seventy-five (75) days

following the Petition Date or is stayed following entry thereof;

(k)      there is a breach of the Purchase Agreement by either Buyer or Seller

thereunder, or the Purchase Agreement at any time ceases to be in full force and effect;

(l)      the transactions contemplated by the Purchase Agreement do not close

within twenty (20) Business Days after the Sale Order is entered; or

(m)      the Debtors modify its existing cash management system without the prior

express written consent of the Agent in each instance.

## VI.
## NOTICE

37.      Notice of this Motion has been given to: (a) the Office of the United States

Trustee; (b) Dycom Industries, Inc. and its counsel; (c) Deutsche Bank Trust Company

Americas, as agent for the Lenders, its counsel, and the Lenders; (d) the Internal Revenue

Service, (e) the Debtors' fifty largest unsecured creditors as set forth in the consolidated list filed

with the Debtors' petitions; and (f) other secured creditors of the Debtors holding liens of record,

if any, (g) parties to certain executory contracts and unexpired leases, (h) the Debtors'

commercial bank, JP Morgan Chase, and (i) certain of the Debtors' insurers and sureties.  In light

of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Interim Cash

Collateral Order; (ii) schedule the Final Hearing; and (iii) grant such other relief as the Court

may deem just and appropriate.


Dated: December 13, 2005                    Respectfully submitted,

                                            ORIUS CORP. AND ITS
                                            AFFILIATE DEBTORS


                                            /s/ Forrest B. Lammiman
                                            One of their Attorneys

                                            Forrest B. Lammiman
                                            Timothy W. Brink
                                            Aaron C. Smith
                                            Timothy S. McFadden
                                            Folarin S. Dosunmu
                                            Lord, Bissell & Brook LLP
                                            115 South LaSalle Street
                                            Chicago, IL  60603
                                            Tel: (312) 443-0675
                                            Fax: (312) 896-6295